# UNITED STATES DISTRICT COURT
for the
District of New Mexico

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. 21-MR-851
THE CELLULAR TELEPHONE ASSIGNED CALL )
NUMBER (804) 625-5977 )
)

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached and incorporated by reference.

located in the _____ District of ____New Jersey____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2423; 18 U.S.C. § 2251; 18 U.S.C. § 2422; 18 U.S.C. § 2252A(a)(2) | Transportation of a minor with intent to engage in criminal sexual activity; Production of child pornography; Coercion and enticement; Distribution/Receipt of child pornography |

The application is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Justin Wingerd, Special Federal Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
~~telephone and electronic signature~~ *(specify reliable electronic means)*.

Date: June 23, 2021

*Judge's signature*

City and state: Albuquerque, New Mexico

Hon. Jerry H. Ritter
*Printed name and title*

U.S. Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (804) 625-5977 | Case No. _____ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Task Force Officer Justin Wingerd, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (804) 625-5977, with listed subscriber(s) Alberto Villanueva Carpio (the "Target Cell Phone"), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the government is concurrently seeking a separate order that complies with the requirements of the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127.

3. I am a Task Force Officer with the Federal Bureau of Investigation (FBI), and have been since May 2021. I am currently a full-time, sworn law enforcement officer with the Albuquerque Police Department (APD), assigned to APD's Sex Crimes Unit, Criminal

Investigations Bureau. I have been with APD since 2014. My duties include investigations on all felony crimes to include but not limited to: Aggravated Battery, Aggravated Assault, Kidnappings, Criminal Sexual Penetration, and all related Domestic Violence investigations. I currently have several years' experience in the writing and execution of search and arrest warrants. I am recognized as a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure (FRCP) 41(a)(2)(C). I am currently assigned to the FBI's Child Exploitation and Human Trafficking Task Force where I investigate a myriad of federal violations including, violent crimes against children, human trafficking, child pornography, online enticement, and sexual exploitation of children. I have received on the job training from other experienced agents in the investigation of federal offenses, to include child pornography and child exploitation offenses.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 2423, 2251, 2422, 2252A(a)(2), and 2252A(a)(5)(B) have been committed by Alberto Villanueva Carpio. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

6. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court

2

of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. On June 17, 2021, at approximately 1830 hours, I was notified of a sexual assault investigation concerning a 16-year-old victim, Jane Doe.[1] Jane Doe is currently enrolled as a high school student within the City of Albuquerque, although she is originally from Honduras and has only been in Albuquerque for approximately two months' time, since April of 2021. On the morning of June 17, 2021, Jane Doe was encouraged by a friend to disclose sexual assault perpetrated by an approximately 43-year-old male adult known to Jane Doe as Alberto Villanueva Carpio (VILLANUEVA). Jane Doe reported this abuse to a teacher at her school, and the school contacted the State of New Mexico Children, Youth, and Family's Department (CYFD).

8. A CYFD investigator met with Jane Doe and obtained copies of Jane Doe school registration paperwork as well as a "State of Texas Power of Attorney Over Child" form, in which VILLANUEVA was purportedly assigned guardianship over Jane Doe. Jane Doe then agreed to participate in a Sexual Assault Nurse Examiner (SANE) examination—from which a Sexual Assault Evidence Kit (SAEK) was obtained.

9. During the course of the SANE examination, Jane Doe reported that she has known for VILLANUEVA for approximately four years' time due to VILLANUEVA being a friend to Jane Doe's father. While they resided in Honduras and when she was 12 years old,

---

[1] Jane Doe's identity is known to law enforcement, but not included here to protect the minor's identify as well as the ongoing criminal investigation.

3

VILLANUEVA frequently and over a span of four years' time, habitually engaged in forced sexual intercourse with Jane Doe.

10. In or around the month of April 2021, Jane Doe and her father were transported from Honduras to the border of the United States where they made contact with VILLANUEVA in the area of Piedras Negras in Mexico. From Piedras Negras, VILLANUEVA transported Jane Doe and her father across the border and—once in the United States—her father left Jane Doe in order to travel to the State of Tennessee and Jane Doe was driven by VILLANUEVA to Albuquerque.

11. Once in Albuquerque, Jane Doe was taken to VILLANUEVA's apartment—identified by Jane Doe as being at the Towers Apartments, Apartment #111, located at 5404 Montgomery Blvd. NE, Albuquerque, NM 87109—where VILLANUEVA consistently engaged in unwanted sexual intercourse with Jane Doe..

12. She advised that the most recent sexual assault had occurred the previous evening, on or around the evening of June 16, 2021. In describing the apartment, Jane Doe stated that she and VILLANUEVA shared a bed within the apartment but that if the bed were not present in the apartment it was due to VILLANUEVA having cleaned the residence in order to flee Albuquerque.

13. Jane Doe described that she did not know anyone in Albuquerque and that during the two months' time that she was forced to live with VILLANUEVA that he did not permit anyone to come to the apartment, he threatened to harm her and her parents if she did not obey him, and she did not feel safe to leave the apartment or reveal her living situation to anyone until she felt encouraged by her friend to do so.

4

14. Jane Doe disclosed that she was initially under the impression that, upon being driven into the United States, she would be then transported to Houston, Texas to where she be reunited with her aunt.

15. During the course of the SANE examination, Jane Doe's personal cell phone repeatedly rang as VILLANUEVA called her phone. Jane Doe did not answer the phone, which prompted VILLANUEVA to send numerous messages under the profile name "Tio" to Jane Doe via the WhatsApp messenger program. After she did not respond, Jane Doe's cell phone began to ring as her father then began to call Jane Doe's cell phone. Jane Doe answered one of her father's calls and her father told her that she was lying about VILLANUEVA, that VILLANUEVA was going to get in trouble without reason, that she belonged to VILLANUEVA, and that he [her father] along with VILLANUEVA were going to come for her. The call from her father had been overheard by the SANE nurse, who later advised me of what she had heard on that phone call.

16. The CYFD investigator took possession of Jane Doe's cell phone and the phone was summarily taken into police custody before being taken into the possession of the FBI. The Device remains in FBI custody within a locked and secured office at this time.

17. Around the time that Jane Doe was transported for her SANE examination, APD field officers attempted to make contact with VILLANUEVA at his apartment, Apartment #111, without success. The officers then contacted the management office for the apartment complex and spoke with maintenance personnel who advised that they had earlier entered the apartment within their own professional capacity, without having been requested to do so by law enforcement, and they observed that the room appeared bare as if the tenant(s) were in

5

preparation to vacate the premises. The maintenance personnel indicated that they did observe what appeared to be "little girl clothing."

18. Jane Doe identified VILLANUEVA as being a human smuggler, who frequently transports individuals from Mexico to the United States in exchange for money. She stated that she understood that her father owed VILLANUEVA approximately $30,000 in exchange for having transported her father and herself into the United States. Jane Doe stated that she believed that she, herself, was to serve VILLANUEVA as the form of payment for his having transported her father and herself into the United States.

19. Jane Doe further advised that VILLANUEVA had taken her passport, copies of her birth certificate, and her additional identification paperwork. She also stated that she only maintains contact with friends and family via her cell phone through the utilization of Facebook and WhatsApp messaging services, which she believes VILLANUEVA uses in order to track her location.

20. A state search warrant was executed on VILLANUEVA's apartment on June 19, 2021 and no one was located inside. Numerous items were seized from the apartment, to include: white-colored bedding from a small mattress located on the floor of a rear bedroom, several pairs of underwear which appeared to belong to a female teenager, one black-colored cell phone located in a box within the bedroom containing the mattress, a small green-colored backpack that appeared to belong to Jane Doe, as well as a second set of gray-colored bedding located in the hallway closet.

21. Jane Doe participated in an emergency forensic interview at a local Albuquerque safe house in which she disclosed a narrative consistent with that as originally provided to law enforcement and the SANE nurse during her SANE examination, with several further points of

clarification. More specifically, Jane Doe stated that she had used her own cell phone to send photographs and/or videos of her naked body to VILLANUEVA, per his request via cell phone.

22. Jane Doe identified the phone number utilized by VILLANUEVA to telephone her as (804) 625-5977.

23. In utilizing law enforcement resources, I ascertained that the provider for VILLANUEVA's cell phone number, (804) 625-5977, is T-Mobile, headquartered at 4 Sylvan Way, Parsippany, NJ 07054. No other primary user of VILLANUEVA's cell phone number is known at this time. Based upon the information obtained throughout the investigation, it is believed that VILLANUEVA continues to utilize the cell phone number (804) 625-5977, by which he telephoned Jane Doe, and that he is likely to continue to use the same cell phone number for at least the next 30 days.

24. In summary, I have probable cause to believe Villanueva may have fled and that his device likely contains evidence of child exploitation offenses, to include the transportation of Jane Doe across international borders for the purpose of VILLANUEVA engaging in criminal sexual intercourse with Jane Doe; the production of child pornography by Jane Doe at VILLANUEVA's request; coercion and enticement of Jane Doe by VILLANUEVA through a facility of interstate commerce; and receipt of child pornography by VILLANUEVA.

25. VILLANUEVA's whereabouts remain unknown at this time.

26. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as

7

"tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

27. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available.

28. Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

8

29. Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

30. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

31. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not

9

authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

32.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

33.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

34.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

*(signature)*

Justin Wingerd
Special Federal Officer
Federal Bureau of Investigation

Subscribed electronically and sworn telephonically to me this
__23__ day of __June__, 2021:

*(signature)*

HONORABLE JERRY H. RITTER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number (804) 625-5977, with listed subscriber(s) Alberto Villanueva Carpio (the "Target Cell Phone"), whose wireless service provider is T-Mobile a company headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2. Records and information associated with the Target Cell Phone that is within the possession, custody, or control of T-Mobile including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

I. **Prospective Information to be Disclosed by the Provider**

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

II. **Historical Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. §

2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **April 1, 2021 to present:**

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i. the date and time of the communication, the method of the communication, and the source and destination of the communication

(such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

### III. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 2423, 2251, 2422, 2252A(a)(2), and 2252A(a)(5)(B) involving Alberto Villanueva Carpio.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.